# Illinois Official Reports

## Appellate Court

---

### *People v. Jones*, 2016 IL App (1st) 141008

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTONIO JONES, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-14-1008 |
| Filed | October 11, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-17444(02); the Hon. Stanley J. Sacks, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Christofer R. Bendik, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, Mary P. Needham, and Brian A. Levitsky, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Presiding Justice Hyman and Justice Neville concurred in the judgment and opinion. |

¶ 1     Following a 2013 jury trial, defendant Antonio Jones was convicted of three counts of attempted murder and three counts of aggravated battery with a firearm, for which he was sentenced to three concurrent terms of 23 years' imprisonment. On appeal, he argues that (1) the trial court erred in barring argument and testimony regarding the defense of justified use of force, (2) trial counsel was ineffective for failing to request jury instructions on affirmative defenses and a lesser-included offense, (3) the State's comments during opening and closing argument were inaccurate and prejudicial, (4) the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), and (5) the trial court failed to consider mitigating evidence in sentencing. For the reasons that follow, we reverse and remand for a new trial.

¶ 2                                 BACKGROUND

¶ 3     In the early morning hours of September 1, 2010, Chicago police officers Glen Evans, James Gochee, and Michael St. Clair were injured while attempting to gain entrance to 7701 South Hoyne Street to execute a search warrant naming Demario Thomas as the subject. Defendant Antonio Jones and codefendant Thomas were indicted on multiple counts of attempted murder, aggravated battery with a firearm, attempted murder of a peace officer, aggravated battery with a firearm of a peace officer, and possession of a controlled substance with intent to deliver. Jones was tried on a theory of accountability for the violent crimes.

¶ 4     In his answer to the State's discovery, Jones indicated that he might assert affirmative defenses of self-defense, defense of others, and defense of property. As support for these theories, Jones planned to introduce evidence that he had previously been the victim of a shooting in his residence in March 2010; however, the State moved *in limine* to bar defense counsel from referencing that incident in opening statements. The court granted the State's motion, telling counsel: "Don't make it in your opening statement, leave it out. We will talk about it later if necessary. You can always say self-defense. The only question is if someone else does the shooting, I'm not sure he can claim self-defense necessarily. *** Make a generic opening statement, leave out the self-defense aspect of it."

¶ 5     Jones and Thomas were tried simultaneously with separate juries. During Jones's jury selection, the court queried the panel as to their understanding of the four principles outlined in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), but instead of asking whether any of the venire did *not* understand and accept the principles, the court, three times out of four, asked the venire whether they *did* "understand and accept that instruction." No members of the venire raised their hands or otherwise responded, which Jones argues on appeal indicates that *no* member of the venire understood or accepted those principles. Nor did panel members respond or raise their hands, when, the fourth time, the court asked whether they did not accept and understand the principle.

¶ 6     The State began its opening statement by characterizing Jones as a "criminal" and went on to refer to Jones as a criminal no less than four times. At the second reference, the following colloquy ensued:

        "LISA LONGO [Assistant State's Attorney]: *** [The police] learned that behind
        that door were two cold-blooded criminals who had reasons to keep those police out.

FRANK TEDESSO [Defense counsel]: I will object to the State continually referring to these defendants as criminals.

THE COURT: Disregard it—I'm ruling on your objection, Mr. Tedesso. Disregard the comment about cold, hard criminals, please. Go ahead."

Nevertheless, the State continued to refer to Jones as a criminal during the remainder of its opening statement.

¶ 7 The State's evidence at trial revealed that on the night of September 1, 2010, a team of 14 to 16 police officers was executing a search warrant at 7701 South Hoyne Avenue in Chicago. The officers parked a short distance away from the home in marked and unmarked cars. While most officers were in plain clothes, they all wore raid vests emblazoned with "Chicago Police Department." The officers approached the back of the home in a single file line, with Officer James Gochee leading the group. Officer Gochee breached the back fence with a battering ram, and the officers then walked approximately 30 feet to the back door. At least three of the officers yelled "Chicago police, search warrant" as they stood outside the door. Officer Gochee banged on the door three times with a battering ram when a gunshot rang out and the glass security door exploded outwards. Officer Gochee, as well as Lieutenant Glen Evans and Officer Michael St. Clair were injured.

¶ 8 The remaining officers retreated and surrounded the perimeter. The officers eventually made phone contact with one of the occupants of the house and instructed those inside to exit. When the occupants complied, the officers took them into custody and commenced a search of the house, during which they recovered weapons, including an "SKS assault rifle," as well as heroin and marijuana.

¶ 9 Inside the house were Jones, Thomas, Paris Banks (Jones's cousin), Leslie Kitchen (Jones's girlfriend at the time), and Jones's grandparents, who owned the house. Both Kitchen and Banks testified to the events of that night, although their trial testimony differed from their statements to police taken immediately following the shooting and their testimony before the grand jury.

¶ 10 In pretrial statements, Kitchen and Banks stated that on the night of August 31, 2010, they were in the back room of the residence with Jones and Thomas watching TV and smoking marijuana. At some point during the evening, Banks brought a gun into the room; according to Banks, he did this at Jones's direction. Around midnight, there was a "boom" at the back door, and it sounded to Kitchen like someone was breaking into the back gate. Kitchen went to the kitchen and looked out of the window, at which point she heard banging at the back door and ran with Jones to the bedroom where Jones's grandparents were sleeping.

¶ 11 Banks told the assistant State's Attorney and the grand jury that as Jones was running to his grandparents' room, he ordered Thomas to "find out who the f*** that is." Thomas grabbed the gun, looked out the kitchen window and informed Jones that it was the police. In response, Jones said "buck [or bust or f***] that bitch," meaning shoot at them. Kitchen also told the grand jury that she heard Jones give that order. Thomas pulled the trigger, but the gun would not fire. He tried a second time, pointing the gun at the back door, and the gun went off. Thomas and Banks then joined Jones and Kitchen in Jones's grandparents' room. Initially, Jones asked Kitchen to take the gun to the basement, but when Kitchen refused, Jones hid the gun in his grandparents' closet, over his grandmother's protests. Shortly thereafter, the police called and the group exited the house at the officers' direction.

¶ 12 At trial, Kitchen admitted to being present at the house on the night of August 31, 2010, and further testified that before she ran to Jones's grandparent's room, she saw Thomas standing with a gun in his hand aimed at the back door. Thomas pulled the trigger, but the gun did not fire. It was not until Kitchen had entered Jones's grandparents' room, where Jones and his grandparents were "panicking," that she heard a gunshot. Kitchen denied that she heard Jones tell Thomas to shoot. She claimed that her earlier testimony to the contrary was prompted by the police.

¶ 13 At trial, Banks, too, denied that a conversation between Jones and Thomas took place before he heard a gunshot. He did, however, admit that Jones asked him to retrieve a gun from under a bed earlier in the evening. Defense counsel attempted to ask Banks about the earlier shooting in Jones's house, but the court sustained the State's objection to this question, saying, "That was discussed earlier. Move on to something else, please."

¶ 14 Following the conclusion of Banks' testimony, the trial court threatened defense counsel with jail if he sought to elicit testimony that Jones had previously been shot in his house. The court stated that the prior shooting was "totally irrelevant" because Jones was "not claiming he's shot [*sic*] in self-defense. He's claiming he's not accountable for the other conduct of the people in the house that night."

¶ 15 Following the conclusion of testimony, the parties presented closing arguments, during which the State argued, without objection, that Illinois law does not permit a person to "shoot first and ask questions later." During Jones's closing argument, the court sustained the State's objections to Jones's counsel's statements that (1) the second amendment permits the possession of firearms in one's house, (2) the police did not videotape Banks' questioning, and (3) Banks may have been the shooter.

¶ 16 The jury found Jones guilty of three counts of attempted murder and three counts of aggravated battery with a firearm but found him not guilty of attempted murder of a peace officer, aggravated battery with a firearm of a peace officer, and possession of a controlled substance with intent to deliver.

¶ 17 At sentencing, Jones's counsel argued in mitigation that Jones had previously been shot in his home six months prior to August 2010, but the court responded that this was "not relevant." Jones, on his own behalf, apologized to his grandmother and his kids. In announcing the sentence, the court stated:

> "Some things change, some things stay the same. A person found [guilty] of serious crime, the first thing his lawyer argues on his behalf [is] well he has kids and is concerned about his kids. I heard that part as well. On September 1, 2010 when this incident took place . . . Antonio Jones and DeMario Thomas, I don't believe they thought about their kids in the slightest on that day. No one. If someone said, 'Hey man, how are your kids doing?' Their response would be 'What kids? I got kids somewhere?' They are facing possible 45 years in prison at 85 percent or whatever it turns out to be. Take care of those kids."

¶ 18 The court ultimately imposed a sentence of 23 years on each count, to be served concurrently. Jones's motion to reconsider his sentence was unsuccessful, and he timely appealed.

¶ 19                                              ANALYSIS

¶ 20        Although Jones raises a number of issues on appeal, the dispositive issue is the propriety of the State's repeated references to Jones as a criminal in its opening statement. The State began its statement as follows: "The greatest danger that a police officer can face during his tour of duty is a gun and a criminal who's willing to use that gun to shoot and kill that police officer. Ladies and gentlemen, each of your juries has sitting before you one such criminal. Defendant Jones and defendant Thomas." The State went on to say, "[The police] learned that behind that door were two cold-blooded criminals who had reasons to keep those police out." Defense counsel objected to the State's continued reference to Jones as a criminal, and the court said, "Disregard it—I'm ruling on your objection, [counsel]. Disregard the comment about cold, hard criminals, please. Go ahead." This did not deter the State, however, as it later continued, "[Y]ou must remember the criminal controls the crime scene. These two defendants were in that house for quite some time with that evidence before they ultimately came out." And finally, the State concluded: "The law recognizes that what one criminal may not be brave enough to do alone, two criminals just might be. So it's as if defendant Jones had his finger on that trigger as did defendant Thomas. Criminals work together and they are equally responsible for crimes they commit."

¶ 21        While the State has wide latitude in making opening statements and closing arguments and is entitled to comment on the evidence (*People v. Pasch*, 152 Ill. 2d 133, 184 (1992)), comments intending only to arouse the prejudice and passion of the jury are improper (*People v. Herndon*, 2015 IL App (1st) 123375, ¶ 36). In particular, this court has often decried the use of derogatory and pejorative terms used to describe the defendant. See, *e.g.*, *People v. Johnson*, 119 Ill. 2d 119, 139-40 (1987) (improper to characterize defendant as an "animal" during closing argument even where characterization based on evidence); *People v. Deloney*, 359 Ill. App. 3d 458, 469 (2005) (criticizing the State's use of pejorative terms ("crack-head") to describe defendant during opening and closing, but finding it did not rise to level of reversible error); *People v. Flax*, 255 Ill. App. 3d 103, 111 (1993) (noting that characterizing a defendant in a "derogatory manner where such characterization is intended to inflame the passions of the jury or arouse the jury's prejudice against the defendant," may be improper, but finding that "bad man" descriptor in closing was a "relatively mild pejorative").

¶ 22        Significantly, this court has implied that the wide latitude to which attorneys are entitled in closing arguments may not necessarily apply to opening statements. Specifically, we have observed that the purpose of an opening statement is "to advise the jury concerning the question of facts and it is not, and should not be permitted to become an argument." *People v. Weller*, 123 Ill. App. 2d 421, 427 (1970). Moreover, the statement should be "brief and general" and "free from material that may tend to improperly prejudice the accused in the eyes of the jury." *Id.* In other words, remarks that may be appropriate for closing arguments may not be appropriate for opening statements.

¶ 23        In any event, comments that "[exceed] the bounds of proper argument" require reversal (*People v. Williams*, 192 Ill. 2d 548, 573 (2000)), only if the "comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them" (*People v. Wheeler*, 226 Ill. 2d 92, 123 (2007)). Stated differently, "[i]f the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted." *Id.* (citing *People v. Linscott*, 142 Ill. 2d

22, 28 (1991)). Our review of whether the State's improper comments mandate a new trial is *de novo*. *Id.* at 121.

¶ 24    The State's opening statement was premised on its characterization of Jones as a "cold-blooded criminal" facing off against police officers. This argument, which did not belong in an opening statement under any circumstances, conjured a powerful image calculated to invoke an emotional response. Certainly, the characterization had no basis in fact, given that prior to this case, Jones had never been convicted of a crime. Thus, we can discern no basis for the State's references to Jones as a criminal other than to inflame the passions of the jury.

¶ 25    The State's derisive characterization was particularly likely to bias the jury against Jones where it was the jurors' first introduction to him, as his attorney had not yet made an opening statement on his behalf. Additionally, the State's repetition of the "criminal" pejorative throughout its opening statement effectively nullified the effect of the court's instruction to disregard the State's characterization of defendant as well as its admonishment that opening statements were not evidence. See *People v. Slabaugh*, 323 Ill. App. 3d 723, 731-32 (2001) ("Although the prompt sustaining of a defense objection and an instruction to disregard the improper statements will generally cure any error, when the State repeatedly attempts to make unfounded arguments, the defendant may be prejudiced despite the sustaining of the objections.").

¶ 26    Also relevant to the prejudice inquiry is the fact that the State's evidence in this case, while undoubtedly sufficient to convict, was not overwhelming. The only evidence that Jones was involved in the shooting were the statements of Kitchen and Banks to the police and the grand jury that Jones told Thomas to shoot, which both Kitchen and Banks disavowed at trial. This relatively thin evidence makes it more likely that the jury was over-persuaded by the State's description of Jones as a criminal, and therefore, a bad person deserving of punishment. *Contra Deloney*, 359 Ill. App. 3d at 470 (overwhelming evidence of defendant's guilt mitigated likelihood that jury convicted defendant based on State's improper remarks). We cannot say that under these circumstances, the State's inflammatory remarks did not contribute to Jones's conviction. See *Wheeler*, 226 Ill. 2d at 123.

¶ 27    Our decision finds support in *People v. Thomas*, 22 Ill. App. 3d 854 (1974). There, defense counsel queried whether a police officer had asked permission to search the defendant's home, and the State objected, saying, "This officer doesn't have to ask a criminal permission for anything." *Id.* at 856-57. Although the court instructed the jury to disregard the word "criminal," we found the State's remark "improper and highly prejudicial," noting:

> "The defendant had no prior record and had not yet presented his defense. The reference to defendant as a criminal, before he had presented his own case, irretrievably prejudiced him in the minds of the jury as a man with a prior record, more likely than others to commit the instant offense. It is clearly reversible error for a prosecutor to suggest to a jury that a defendant has committed other offenses unrelated to the one for which he is being tried, even when the jury is instructed to disregard the comment. [Citation.] *** Further, the state's reference to the defendant as a criminal indicated to the jury the prosecutor's personal belief in the guilt of the defendant. It is well settled that it is improper for a prosecuting attorney to state his own individual opinion or belief of the defendant's guilt." *Id.* at 857.

Ultimately, we concluded that the "criminal" reference, coupled with the State's comment in closing that the defendant had failed to produce certain alibi witnesses, entitled the defendant to a new trial. *Id.* at 858.

¶ 28    Just as in *Thomas*, Jones, too, did not have a criminal record and had not presented his own case when the State repeatedly labeled him a "criminal," thus implying that he had committed prior crimes. And while the State here did not criticize Jones's failure to put on a defense, its persistence in characterizing Jones as a criminal following the court's instruction to disregard the initial comment aggravated its misconduct and compels us to conclude that the State's improper comments were intentional and require reversal.

¶ 29    Finally, we are mindful that our supreme court has emphasized its " 'intolerance of *** prosecutorial misconduct' " noting that " 'threats of reversal, and words of condemnation and disapproval[ ] have been less than effective in curbing prosecutorial misconduct.' " *Wheeler*, 226 Ill. 2d at 122 (quoting *People v. Johnson*, 208 Ill. 2d 53, 66-67 (2003)). The State's misconduct here requires us to do more than merely express our disapproval, given that the State's improper comments may have contributed to Jones's conviction.

¶ 30    Having found that Jones is entitled to a new trial due to the State's improper comments during opening statements, we limit the remainder of our discussion only to the issues Jones identifies that are likely to reoccur. Chief among these is the question of whether a defendant, charged under a theory of accountability, may rely on the justified use of force defenses (*e.g.*, self-defense, defense of others, and defense of property).

¶ 31    The State tried Jones on the attempted murder and aggravated battery charges under a theory of accountability; pursuant to the Criminal Code of 2012, a person is legally accountable for the conduct of another when "with the intent to promote or facilitate [the commission of an offense], he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." See 720 ILCS 5/5-2(c) (West 2014).

¶ 32    Jones's primary arguments on appeal concern his inability to present evidence and argument that he was justified in instructing Thomas to shoot the officers—who Jones believed were intruders—because he was acting in self-defense and defense of his property. "The elements of self-defense are: (1) that unlawful force was threatened against a person;[1] (2) that the person threatened was not the aggressor; (3) that the degree of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable." *People v. Lee*, 213 Ill. 2d 218, 225 (2004).

¶ 33    The trial court did not believe that Jones, tried under an accountability theory, could claim that his own actions, *i.e.*, telling Thomas to shoot, were taken in self-defense but was instead required to prove that Thomas, the principal actor, was acting in self-defense. In briefing before this court, the State argued in support of the trial court's ruling but conceded at oral argument that the trial court's interpretation of the law was incorrect.

---

[1]Obviously, the success of this defense depends on the trier of fact believing that, as Jones contends, he did not know the people attempting to gain entry into his grandparents' house were police officers. See *People v. Hutter*, 29 Ill. App. 3d 92, 99, 101-02 (1975) (accepting the defendant's argument that he could assert self-defense if he was unaware that those whom he shot at were police officers).

¶ 34    While no Illinois case has squarely addressed this issue, our supreme court's interpretation of accountability principles supports the State's concession. Specifically, the court, in contrasting accountability with felony murder, has noted that "accountability focuses on the degree of culpability of the offender and seeks to deter persons from intentionally aiding or encouraging the commission of offenses." *People v. Dennis*, 181 Ill. 2d 87, 105 (1998). An accountable defendant who promotes or facilitates a crime by another in the belief that self-defense is necessary is not culpable at all, while an accomplice whose subjective belief in the necessity to use force is unreasonable is less culpable than a principal who does not share that belief. Moreover, as Jones noted during oral argument, the statute on accountability does not bar a defendant tried under an accountability theory from asserting justified use of force defenses. See 720 ILCS 5/5-2 (West 2012). Indeed, Illinois law does not draw a distinction between the perpetrator of an offense and one who is accountable for his conduct: "the accountable defendant stands in the shoes of the accomplice." *People v. Brown*, 197 Ill. App. 3d 907, 919 (1990). Thus, it follows that "[i]f the law places upon the accountable defendant all the liability arising from the acts of the accomplice, the law should also afford the accountable defendant the protections which would be afforded the accomplice." *Id.* In other words, given that a principal is generally entitled to maintain that his use of force was justified, an accomplice may similarly take advantage of this defense, even if it is based on his own belief and not that of the principal's.

¶ 35    For these reasons, on retrial, Jones should be permitted to argue and present evidence that he acted in self-defense or defense of property when he told Thomas to shoot.[2]

¶ 36    We need not reach the remainder of Jones's arguments, which include alleged error in the court's Rule 431(b) questioning of jurors and ineffective assistance of counsel given that we are remanding for a new trial.

¶ 37    Jones's claim that his sentence was excessive is also moot in light of our decision that he is entitled to a new trial, but we are compelled to comment on the trial court's statements during sentencing, which we find highly offensive. The court evinced a categorical bias against defendants like Jones who apologize to their children after committing crimes and belittled Jones's (and Thomas's) concern for their children specifically, stating, "I don't believe they thought about their kids in the slightest on that day. No one. If someone said, 'Hey man, how are your kids doing?' Their response would be 'What kids? I got kids somewhere?' " While a "cold" record rarely conveys the tone with which words on the page are spoken, the court's comments here leave little doubt that they were derisive and intended to malign an entire class of criminal defendants. We do not intend to suggest that the court could not disbelieve the sincerity of Jones's purported concern for his children but instead find fault with the court's *categorical* disbelief of *any* defendant who claimed such concern. The court's sarcasm was unwarranted and wholly inappropriate.

¶ 38    " 'Judges are required to be fair and dispassionate arbitrators above all else.' " *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 80 (quoting *People v. Phuong*, 287 Ill. App. 3d 988, 994 (1997)). Indeed, the Illinois Code of Judicial Conduct requires a judge to be "patient, dignified, and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in

---

[2]This is not to say that all evidence Jones cites in support of his self-defense claim will be admissible, however. We leave it to the trial court to determine the admissibility of Banks' testimony that Jones had been shot in his apartment six months earlier.

an official capacity." Ill. S. Ct. R. 63A(3) (eff. July 1, 2013). The court's sarcastic and biased comments reflected neither dignity nor courtesy, and for this reason, we believe that the trial on remand should take place before a different judge. See *Johnson*, 2012 IL App (1st) 091730, ¶ 82 (reaching same conclusion after finding that the court's comments during trial did not comport with well-established standards of judicial conduct).

¶ 39                                                    CONCLUSION

¶ 40          For these reasons, we reverse and remand for a new trial.

¶ 41          Reversed and remanded.