2022 IL App (1st) 200297-U

No. 1-20-0297

Order filed May 11, 2022

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 4941 |
| | ) | |
| JOSIAH WARREN, | ) | Honorable |
| | ) | Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Gordon and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's conviction for aggravated unlawful use of a weapon over his challenges to the admission of gang evidence, the effectiveness of counsel regarding the admission of that evidence, and alleged misconduct during the State's opening statement and closing argument.

¶ 2    Following a jury trial, defendant, Josiah Warren, was found guilty of aggravated unlawful use of a weapon (AUUW) and sentenced to one year in prison. On appeal, defendant contends that the trial court should have excluded evidence that he possessed a firearm because of a gang dispute

as unfairly prejudicial under Illinois Rule of Evidence 403 and as improper expert opinion testimony, and that counsel was ineffective for failing to object to the gang evidence. Defendant also argues that he was denied a fair trial because the State's opening statement and closing argument were improper. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant was charged with 10 counts of AUUW.[1] Relevant here, count I alleged that, on March 15, 2019, defendant knowingly carried an uncased, loaded, and immediately accessible firearm on his person when he had not been issued a valid concealed carry license or Firearm Owner's Identification (FOID) card (720 ILCS 5/24-1.6(a)(1)/(3)(A-5)(C) (West 2018)). Count VII alleged that he knowingly carried a firearm on his person when he had been adjudicated a delinquent minor due to his conviction for aggravated robbery in a 2013 case (720 ILCS 5/24-1.6(a)(1)/(3)(D) (West 2018)).

¶ 5      Prior to trial, the State moved *in limine* to admit defendant's postarrest statement to police. After being advised of his *Miranda* rights, defendant told police that

> "he had the gun for the ops. That he is into it with the guys from 21st and St. Louis.
>
> And he was then shown the gun and told the officers he bought it. He then asked the officers if he could – if they could give him his little gun back in exchange for a dirty gun."

Defendant did not object to the admission of his statement in general but indicated that he "might have an objection" to how police witnesses would define "ops" and "dirty."[2] The State indicated

---

[1] The State *nol-prossed* all but two counts prior to trial.
[2] The report of proceedings spells the term referring to opposing gang members as both "ops" and "opps." Hereafter, we will spell it as "opps" for consistency.

that police officer witnesses would testify that "opps" meant "opposing gang members" and "dirty" meant "a gun that has been used in the commission of a homicide." The court allowed this definition of "opps," but did not allow police witnesses to define a "dirty gun" as only being a firearm involved in a homicide.

¶ 6    The State's opening statement began as follows:

"In our society, we all have to abide by certain rules. We learned these rules as children. They follow most aspects of our lives.

We may not always like these rules, but they help keep us safe and they maintain order, especially when they involve possession of a dangerous weapon like a gun. These rules are specific, and only qualified individuals are allowed to have guns. This defendant is not one of those people qualified to have a firearm.

We expect the evidence to show that the defendant doesn't care about the rules. He doesn't need a FOID card. He doesn't need a concealed carry license. He doesn't care about having those things.

The defendant didn't just break the rules in this case. He broke the law."

The State then summarized the expected testimony and explained that, at the conclusion of the trial, it would ask the jury to find defendant guilty of "unlawfully possessing a firearm."

¶ 7    Chicago police officer Michael Callahan testified that he was on duty, in uniform, and driving a police vehicle with his partners, Officers Murphy and Meseck, on March 15, 2019. At approximately 11:16 a.m., Callahan was driving south on South Lawndale Avenue, approaching the intersection with West Douglas Boulevard. He saw defendant, whom he identified in court, and another person walking north on the east sidewalk of Lawndale. Callahan stopped and exited

his vehicle to ask defendant questions about a murder that occurred two and a half weeks prior. Defendant "grabbed on his jacket, turned and began running southbound on the sidewalk." Based on Callahan's experience, defendant grabbing his side suggested that he was holding a firearm. As defendant ran away, Callahan saw "the butt of a handgun sticking out of the jacket," so he drew his own firearm.

¶ 8    Callahan and Murphy chased defendant on foot. When defendant crossed Douglas Boulevard, he put his hands in the air and Callahan ordered him to stop, but defendant continued running. Murphy stopped on Douglas Boulevard because Callahan told him that he believed that defendant dropped a firearm there. Callahan continued chasing defendant on foot. Defendant ran one block east to Millard Avenue and stopped when Meseck blocked his path with the police vehicle.[3] Meseck handcuffed defendant and conducted a patdown search of him. Callahan returned to Douglas Boulevard and found a semiautomatic handgun in the parkway, near where he saw defendant raise his hands as he was running. Callahan recovered the firearm, its magazine, and a round from the chamber. Murphy inventoried the firearm.

¶ 9    At the police station, Murphy advised defendant of his *Miranda* rights. Defendant indicated that he understood his rights and agreed to speak with the officers. Callahan asked defendant why he had the firearm, and defendant said, "I have it because I am into it with the guys from 21st and St. Louis." Defendant described "the guys from 21st and St. Louis" as "opps," which is "[s]treet language for opposition, opposition being rival gang members." Callahan testified that

---

[3] The report of proceedings misspells the name of this street as "Mallard."

"I can't remember if – the 21st and St. Louis area is the Danny Mob Vice Lords. I don't remember if the defendant said the Danny Mob guys or just the guys from and I just assumed it was the guys from – the Danny Mob from 21st and St. Louis."

Defendant asked if Callahan "could give him his little gun back" and said that "he would get [Callahan] a dirty gun." Callahan then showed defendant the firearm that he recovered and asked defendant where he got it. Defendant said that he bought it. Callahan identified the firearm, its magazine, and ammunition. The State moved these items into evidence, along with an overhead map of the area near Douglas and Lawndale.

¶ 10    Officers William Murphy and Jack Meseck testified that they were on duty and riding in a police vehicle with Callahan on March 15, 2019. Both officers testified consistently with Callahan's account of the incident. Meseck did not recover anything from defendant's person when he searched defendant. Meseck identified the firearm and ammunition that he and Callahan recovered in the parkway of Douglas Boulevard after defendant was arrested. Murphy testified that, at the police station, he advised defendant of his *Miranda* rights and defendant indicated that he understood them. Murphy showed defendant the firearm that the officers recovered on Douglas and asked defendant where he got it. Defendant said that he bought it. Defendant also said that "he had the gun for the opps and he was into it with a gang from 21st and St. Louis area." Defendant "wanted to know if he could get his old gun back in exchange for a dirty one."

¶ 11    Sergeant Terrance Pratscher testified that he was on duty, in uniform, and driving a marked police vehicle on March 15, 2019. At approximately 11:15 a.m., he responded to a call of a foot chase near Douglas and Lawndale. As Pratscher approached the area, he saw a man running south across Douglas, pursued by one officer on foot, as well as an unmarked police vehicle. Pratscher

parked his vehicle and heard over the radio that officers had detained a person. He encountered Callahan and Murphy in the parkway of Douglas Boulevard. Callahan said, "[I]t's got to be right there," and pointed at the parkway. Pratscher saw a firearm in the grass of the parkway, which Callahan recovered. The State moved into evidence a video recording from Pratscher's body camera. The video depicts two men in civilian clothing, whom Pratscher identified as Callahan and Murphy, walking around a grassy area between two streets. One of the men recovers a black handgun from the grass near the curb and appears to eject its magazine and one round. Pratscher testified that was "the recovery of the handgun as [he] observed it."

¶ 12    The parties stipulated that defendant had not been issued a valid FOID card or concealed carry license as of March 15, 2019, and that he had previously been adjudicated a delinquent minor.

¶ 13    Defendant testified that, on March 15, 2019, he was walking on Lawndale with a friend when an unmarked police vehicle stopped in front of him. A police officer exited and said that defendant had an "investigation alert" and that he wanted to ask defendant about a homicide. Defendant denied that he had a firearm. He ran away from the officer with his hands up because he does not trust police and is terrified of them. As defendant was running, one of the officers told him to freeze, so defendant turned around and said, "[D]on't shoot." The officer searched defendant and asked him "where the f*** gun at;" defendant responded that he did not have anything. The officers then handcuffed defendant and transported him to a police station. Defendant did not tell police that he had a firearm, that he bought a firearm, that he was "into it with some other gang," or that he would exchange the firearm for any reason.

¶ 14    In closing, the State first discussed FOID card and concealed carry license requirements for possessing a firearm, as well as the fact that an adjudication of delinquency for a crime that

would have been a felony disqualifies one from possessing a firearm. The State then addressed the instructions on the elements of AUUW, and the evidence establishing that defendant possessed a firearm. It then argued that:

> "[A] responsible gun owner would keep a gun like this in some kind of holster, something that would secure it to your waste [*sic*] or your body in a way that it is not going to be flapping around, falling out, accidentally pressing the trigger. That's what a responsible gun owner would do.
>
> \*\*\*
>
> Ladies and gentlemen, from the moment the defendant locked eyes with Officer Callahan, he has been avoiding responsibility for his decision to carry a loaded pistol on the streets of Chicago."

¶ 15    During deliberations, the jury asked the court six questions via notes. The jury asked (1) to see police policy regarding how officers should record confessions, (2) whether there was a police report regarding the officers' interview of defendant, (3) to review the transcript of Callahan's testimony that he saw the firearm in defendant's jacket pocket, (4) for additional instructions on circumstantial evidence, (5) whether the reasonable doubt standard applied to count I, and (6) whether a reasonable inference was the same as reasonable doubt. After the court answered these questions, the jury found defendant guilty on both counts.

¶ 16    Defendant filed a motion for new trial, which argued in relevant part that "[t]he Assistant State's Attorney made prejudicial, inflammatory and erroneous statements in closing argument designed to arouse the prejudices and passion of the jury, thereby prejudicing the defendant[']s right to a fair trial." At the hearing on that motion, defendant only argued that the State failed to

prove his guilt beyond a reasonable doubt. The court denied defendant's motion for a new trial, merged the counts, and sentenced defendant to one year in prison. Defendant filed a motion to reconsider his sentence, which was denied.

¶ 17    Defendant timely appealed.

¶ 18                                    II. ANALYSIS

¶ 19    On appeal, defendant argues that the trial court erred in admitting gang evidence, that his counsel was ineffective for failing to object to the gang evidence, and that he was denied a fair trial because certain remarks during the State's opening statement and closing argument were improper.

¶ 20    The State maintains that defendant has forfeited his challenges to the admission of gang evidence, opening statement, and closing argument. We agree. To preserve an issue for review on appeal, a defendant must make an objection during trial and raise the issue in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48. As explained further below, it appears that defendant objected to the admission of the portion of his statement that referred to "opps" and how police witnesses would define that term, but he did not object to Callahan's identification of the "opps" at 21st and St. Louis as Danny Mob Vice Lords. More importantly, defendant did not raise any arguments regarding gang evidence in his motion for a new trial. He has forfeited all challenges to the admission of gang evidence. See *id.* Similarly, defendant did not object during the State's opening statement or initial closing argument.[4] His motion for a new trial challenged the State's closing argument, but it did not mention opening statement. Defendant did not take the necessary

---

[4] Defendant made one objection during the State's rebuttal closing argument, which the court sustained. However, the State's rebuttal closing argument is not at issue in this appeal.

steps to preserve the admission of gang evidence and the propriety of the State's opening statement and closing argument for appeal, so he has forfeited those issues. See *id.*

¶ 21    Defendant acknowledges that he forfeited these issues but asks us to review them for plain error. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). We can review forfeited claims (1) "when a clear or obvious error occurred and the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant," or (2) "when a clear or obvious error occurred, and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Moon*, 2022 IL 125959, ¶ 20 (not yet released for publication and subject to revision or withdrawal) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). In this case, defendant only asserts first-prong plain error, *i.e.*, he claims that the evidence was closely balanced. Defendant has the burden to demonstrate plain error. See *id.* (citing *Herron*, 215 Ill. 2d at 187). The first step of plain error review is to determine whether a clear or obvious error occurred. *Id.* ¶ 22 (citing *People v. Sims*, 192 Ill. 2d 592, 621 (2000)).

¶ 22    Defendant first contends that the trial court erred in admitting the portion of his postarrest statement that referred to "opps," in allowing the officers to define "opps" as opposing gang members, and in allowing Callahan to testify that the "opps" at 21st and St. Louis were members of the Danny Mob Vice Lords gang, specifically. Defendant also argues that counsel was ineffective for failing to object to the admission of gang evidence.

¶ 23    Defendant argues that the trial court should have excluded his statement's reference to "opps" and the officers' testimony that "opps" are opposing gang members as unfairly prejudicial

under Rule 403. Evidence is generally admissible if it is relevant. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Evidence is relevant if it has any tendency to make any fact of consequence more probable or less probable than it would be without the evidence. Ill. R. Evid. 401 (eff. Jan. 1, 2011). However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 24 In general, gang evidence is admissible to show motive for an otherwise inexplicable act or common purpose or design. *People v. Guerrero*, 2020 IL App (1st) 172156, ¶ 41 (citing *People v. Smith*, 141 Ill. 2d 40, 58 (1990)). However, "street gangs are regarded with considerable disfavor," so there may be strong prejudice against street gangs in metropolitan areas. *People v. Pikes*, 2013 IL 115171, ¶ 25. "[E]vidence indicating a defendant is a member of a gang or involved in gang-related activity is admissible only where there is sufficient proof that membership or activity in the gang is related to the crime charged." *Id.* As with other evidence, before gang evidence is admitted, the trial court must determine that the gang evidence is relevant and that its probative value is not substantially outweighed by its prejudicial effect. *People v. Johnson*, 208 Ill. 2d 53, 102 (2003); *People v. Morales*, 2012 IL App (1st) 101911, ¶ 40. We review the trial court's evidentiary rulings for an abuse of discretion. *People v. Talbert*, 2018 IL App (1st) 160157, ¶ 28. We will only reverse if the trial court's decision was fanciful or arbitrary, or if no reasonable person would agree with it. *Id.* We will not find an abuse of discretion if reasonable minds could differ about the admissibility of the evidence. *Id.*

¶ 25 We find that the trial court did not commit clear or obvious error in admitting defendant's statement that he possessed the firearm because of a conflict with opposing gang members. Defendant's possession of a firearm was an element of AUUW (see 720 ILCS 5/24-1.6(a)(1) (West

2018)), and whether he possessed a firearm was in dispute. The State's theory was that defendant had a firearm in his jacket, which he dropped in the parkway of Douglas Boulevard while running from police. Defendant denied that he possessed a firearm. Defendant's statement established that he had a motive for possessing a firearm because of a conflict with rival gang members in the area.[5] In turn, that motive for having a firearm made it more likely that defendant did, in fact, possess a firearm on March 15, 2019. The gang evidence was relevant.

¶ 26    Furthermore, the probative value of this evidence was not outweighed by the danger of unfair prejudice. The State did not focus on this issue. The gang evidence was only briefly mentioned during closing argument. There are no indications that the jury focused on this issue during deliberation. Of the six questions that the jury asked the trial court, none concerned the gang evidence. On the contrary, the jury's notes suggest that the jury carefully considered the evidence and the instructions and did not decide this case based on prejudice or emotion. Moreover, the jury heard defendant deny that he was involved in a gang dispute, or that he told the officers as much. Although the gang evidence likely resulted in *some* prejudice to defendant, the record does not support his claim that that evidence "flamed the jury's hatred and fear of gangs." We find that the court did not commit clear or obvious error in admitting gang-related evidence of defendant's motive for possessing a firearm.

¶ 27    Defendant argues that the State could have established his motive for possessing a firearm in a less prejudicial way by characterizing his dispute with people at 21st and St. Louis as "a neighborhood conflict" rather than a gang conflict with "opps." That may have been a less

_____

[5] We take judicial notice of the fact that, according to Google Maps, 21st and St. Louis is approximately seven blocks from where the officers first saw defendant at Douglas and Lawndale. See *People v. Davila*, 2022 IL App (1st) 190882, ¶ 29 (not yet released for publication and subject to revision or withdrawal) (citing *People v. Clark*, 406 Ill. App. 3d 622, 632-34 (2010)).

prejudicial approach, but it would have undermined the probative value of defendant's statement. It was proper for the State to demonstrate defendant's gang involvement through his own statement (see *People v. Matthews*, 299 Ill. App. 3d 914, 923 (1998) (the State can demonstrate gang involvement through a defendant's own admission)), which referred to "opps." The officers' explanation that "opps" meant opposing gang members was necessary to put defendant's statement into context for the jury. Defendant possessed a loaded firearm because rival gang members were nearby. In addition, the cases that defendant cites are distinguishable and do not compel reversal. *People v. Hoerer*, 375 Ill. App. 3d 148 (2007) did not involve gang evidence at all, and *People v. Joya*, 319 Ill. App. 3d 370 (2001) involved the use of gang evidence to prove common design, not motive. Accordingly, we find no clear or obvious error in the trial court's admission of the portion of defendant's postarrest statement referring to "opps" or in allowing police witnesses to testify that "opps" means rival gang members.

¶ 28 Defendant also contends that Callahan was not qualified as an expert, so he should not have opined that "the guys from 21st and St. Louis" were members of the Danny Mob Vice Lords gang. Generally, a police officer's testimony regarding gang activity must qualify as an expert opinion. *Matthews*, 299 Ill. App. 3d at 922. A witness qualifies as an expert if, " 'because of his skill, training, or experience, he is better able to form a more accurate opinion as to the matter under consideration than is an ordinary person.' " *People v. Clifton*, 342 Ill. App. 3d 696, 707 (2003) (quoting *People v. Ayala*, 208 Ill. App. 3d 586, 593 (1990) (discussing police testimony about gang activity)). Specialized formal training is not necessary for a witness to qualify as an expert; the witness's experience alone may be sufficient. *Id.* So long as the expert opinion testimony is

based on information " 'of a type reasonably relied upon by experts in the field,' " it is proper. *Id.* (quoting *People v. Jackson*, 145 Ill. App. 3d 626, 634 (1986)).

¶ 29    The only evidence of Callahan's qualifications was that he had been a police officer for 10 years and attended the police academy. We cannot say that Callahan was qualified to testify as an expert on gangs. But, regardless of whether he was qualified, the record is not clear that Callahan expressed an opinion at all. He testified:

"Q. Did the defendant refer to the guys from 21st and St. Louis as anything in particular?

A. I can't remember if – the 21st and St. Louis area is the Danny Mob Vice Lords. I don't remember if the defendant said the Danny Mob guys or just the guys from and I just assumed it was the guys from – the Danny Mob from 21st and St. Louis."

We cannot say that the admission of this testimony constituted clear or obvious error.

¶ 30    Even if Callahan was improperly opining that "the guys from 21st and St. Louis" were Danny Mob Vice Lords, the admission of that testimony did not constitute first-prong plain error because the evidence was not closely balanced. In evaluating whether the evidence was closely balanced, we must make a qualitative, commonsense assessment of all the evidence within the context of the case. *Sebby*, 2017 IL 119445, ¶ 53. We focus on the evidence of the elements of the charged offenses and any evidence regarding the witnesses' credibility. *Id.* In this case, there was no dispute that defendant did not have a valid FOID card or concealed carry license, or that he had been adjudicated a delinquent minor. The only element of AUUW that was in dispute was defendant's possession of a firearm. To establish that element, the State introduced defendant's admission to possessing the firearm, the firearm itself, the testimony of three officers who found

the firearm in the parkway of Douglas Boulevard shortly after defendant ran through that area, and a body camera video depicting the officers' recovery of the firearm. This case was not closely balanced. *Cf. People v. Naylor*, 229 Ill. 2d 584, 607 (2008) (evidence was closely balanced where both sides offered testimony supporting different, plausible versions of events and no extrinsic evidence corroborated or contradicted either version).

¶ 31    We disagree with defendant's contention that the jury's questions somehow convert the evidence to closely balanced. The jury's questions indicate that they were paying close attention to the evidence and the instructions. The notes do suggest that the jury was specifically interested in Callahan's testimony about seeing the firearm in defendant's jacket and how defendant's postarrest statement might have been documented. However, we need not extrapolate those notes to a conclusion that the jury did not believe Callahan or the officers' testimony about what defendant said at the police station. See *People v. Nugen*, 399 Ill. App. 3d 575, 584 (2010); see also *People v. Vasquez*, 368 Ill. App. 3d 241, 251 (2006) (evidence not closely balanced despite jury note indicating deadlock). Just because a jury thinks that certain evidence is important does not mean that the jury is skeptical of that evidence. We also note that the jury's deliberations were relatively short at approximately two and a half hours. *Cf. People v. Walker*, 211 Ill. 2d 317, 326, 342 (2004) (evidence closely balanced where jury requested a witness's testimony *and* deliberated for two days).

¶ 32    Defendant cites *People v. Lee*, 2019 IL App (1st) 162563, in support of his claim that the evidence was closely balanced. *Lee* is distinguishable in several respects. First, *Lee* was a credibility contest between police witnesses and the defendant, with no corroborating evidence supporting either side's version of events. *Lee*, 2019 IL App (1st) 162563, ¶ 70. As explained

above, the case before us involved extrinsic evidence that corroborated parts of the State's theory, and no corroborating evidence of defendant's theory. That is, this case was not a pure credibility contest. Second, in *Lee*, the jury sent out multiple notes indicating that they were deadlocked and deliberated for nine hours over two days. *Id.* ¶ 71. By contrast, in this case, the jury never indicated that they were deadlocked and deliberated for approximately two and half hours on one day. *Lee* offers little guidance under the facts in this case. Accordingly, we do not find plain error regarding the trial court's admission of gang evidence.

¶ 33    Defendant next argues that counsel rendered ineffective assistance by failing to object to the admission of gang evidence. We review trial counsel's performance under the two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Domagala*, 2013 IL 113688, ¶ 36. To prove that counsel was ineffective, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's errors prejudiced the defendant. *Id.* Prejudice means a reasonable probability that the outcome of trial would have been different. *Id.* Upon review, we are highly deferential to counsel's decisions of trial strategy, and the defendant must overcome a strong presumption that counsel's trial strategy was sound. *People v. Manning*, 241 Ill. 2d 319, 334 (2011). If a defendant fails to establish either prong of the *Strickland* test, his claim of ineffective assistance fails. *People v. Colon*, 225 Ill. 2d 125, 135 (2007).

¶ 34    Defendant's claim that counsel did not object to the admission of gang evidence is not accurate. During pretrial argument on the State's motion *in limine*, the following exchange occurred:

> "THE COURT: I am going to allow the State [to] introduce any proper evidence that's admissible pursuant to the rules of evidence.

From what you have told me, this appears to be a statement of the defendant that would be properly admitted.

There is no objection voiced by the defense that would preclude the statement from being admitted.

[THE STATE]: Thank you, Your Honor.

[DEFENDANT]: Well, Judge, there is Paragraph 2 though of it which is – testify where the State asks for Office Callahan to testify with regards to his understanding of op[p]s and dirty.

That I might have an objection to just as it's speculative."

Counsel did object to police witnesses identifying "opps" as rival gang members. The trial court interpreted counsel's concern as an objection because, shortly thereafter, the court specifically ruled that it was "reasonable" for the State's witnesses to define "opps" as opposing gang members. But even if counsel failed to object, the admission of this evidence did not prejudice defendant within the meaning of *Strickland*. Defendant's conflict with nearby rival gang members explained why he would have a firearm. It was simply one piece of motive evidence to help establish that defendant did, in fact, possess a firearm, and it was not a focus of the State's case. Even without this evidence, there was still direct evidence of defendant's possession of a firearm in the form of eyewitness testimony, a video of the recovery of the firearm, and the firearm itself. Defendant has not established prejudice under *Strickland*, and his claim of ineffective assistance fails. Accordingly, we reject defendant's claim of ineffective assistance of counsel.

¶ 35    Defendant's final contention is that the prosecution's improper opening and closing statements deprived him of a fair trial. Defendant has forfeited his challenges to the State's opening statement and closing argument, but we will review them for first-prong plain error.

¶ 36    Defendant contends that the State's opening wherein the ASA claimed that defendant did not "care about the rules" of society, was argumentative, insinuated that he had a propensity for criminal behavior, and suggested an improper "us-versus-them" theme. Due process guarantees the defendant a fair and impartial trial under both the United States and Illinois Constitutions. U.S. Const., amend. XIV; Ill. Const. 1970, art. 1, § 2. The State generally has wide latitude to discuss the case during its opening statement (*People v. Pasch*, 152 Ill. 2d 133, 184 (1992)), including the evidence that will be presented and matters that may be reasonably be inferred from that evidence (*Smith*, 141 Ill. 2d at 63). However, an opening statement cannot be argumentative, and comments intended "only to arouse the prejudice and passion of the jury are improper." *People v. Jones*, 2016 IL App (1st) 141008, ¶ 21. The standard of review for opening statements is unclear. *People v. Williams*, 2020 IL App (1st) 163417, ¶ 41. Courts have used both a *de novo* standard (see, *e.g.*, *Jones*, 2016 IL App (1st) 141008, ¶ 23) and an abuse of discretion standard (see, *e.g.*, *People v. Trotter*, 2015 IL App (1st) 131096, ¶ 43). We need not resolve this apparent conflict because our conclusion would be the same under either standard of review.

¶ 37    We do not find clear or obvious error in the portion of the opening statement that defendant challenges. We have read the opening statement of the prosecution and do not find that it suggested defendant's propensity for criminal behavior. In addition, we do not find the State's opening was argumentative. The State suggested that the evidence would show that defendant broke the law by possessing a firearm without a FOID card or concealed carry license. That is what count I alleged,

so it was proper for the State to tell the jury that the evidence would establish an element of one of the charged offenses.

¶ 38    The State cannot, and did not here, suggest an "us-versus-them" mentality to the jury. See *People v. Wheeler*, 226 Ill. 2d 92, 129 (2007). The State's reference to some undefined rules of society that "we all have to abide" because "they help keep us safe" did not mean that defendant had or would put the jury in danger. *Cf. People v. Deramus*, 2014 IL App (1st) 130995, ¶¶ 57, 59 (State improperly aligned itself with the jury when it argued that "what defendant did was wrong, but *most importantly, it's what he's doing to us*") (Emphasis in original.). Even if the State obliquely suggested an "us-versus-them" theme, we are not "obligated to assume that the jury accepted a comment's most damaging interpretation." See *People v. Brooks*, 246 Ill. App. 3d 777, 784 (1993). Furthermore, the trial court cured any prejudice to defendant by instructing the jury that "[n]either opening statements nor closing arguments are evidence." See *People v. Myers*, 249 Ill. App. 3d 972, 978 (1991). Because the jury was properly instructed, we presume that they followed the law. See *People v. Sutton*, 353 Ill. App. 3d 487, 501 (2004). Accordingly, we find no error in the challenged portions of the State's opening argument.

¶ 39    Finally, defendant contends that the State's closing argument improperly criticized his decision to exercise his right to stand trial and encouraged the jury to punish him for being an irresponsible gun owner. In closing, the State may comment on the evidence presented at trial and draw reasonable inferences from that evidence, even if those inferences reflect poorly on the defendant. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). Defendant "faces a substantial burden in attempting to achieve reversal of his conviction based upon improper remarks made during closing argument." See *People v. Moore*, 358 Ill. App. 3d 683, 693 (2005). We review the State's

arguments in their entirety and view allegedly improper remarks in context. *Wheeler*, 226 Ill. 2d at 122. Even if the State's remarks were improper, we will not reverse the jury's verdict unless the remarks resulted in substantial prejudice, that is, if the improper comments were a material factor in the defendant's conviction. *Id.* at 123.

¶ 40     We find no clear or obvious error in the State's closing argument. Most of the State's closing argument focused on the evidence of defendant's possession of a firearm. The State did not mention defendant's choice to go to trial at all. We do not interpret the State's argument that defendant "has been avoiding responsibility for his decision" as an attack on his right to a trial. Nor do we find the State's discussion of what a responsible gun owner would do to be improper. An element of AUUW as charged was that defendant's firearm was "uncased." See 720 ILCS 5/24-1.6(a)(1)/(3)(A-5) (West 2018). The State was simply highlighting the evidence in support of this element by contrasting defendant's behavior with the options for securing a firearm when in public. The State was not, as defendant claims, accusing him of the crime of reckless conduct. In fact, it did not mention that crime or the word "reckless" at all. We find no error in the challenged portion of the State's closing argument.

¶ 41     Defendant's citation to *People v. Williams*, 2020 IL App (1st) 163417 is misplaced. In *Williams*, the defendant was found guilty of armed habitual criminal based on his possession of a firearm after having been previously convicted of burglary and the manufacture or delivery of a controlled substance. *Williams*, 2020 IL App (1st) 163417, ¶¶ 1-2. On appeal, we reviewed his challenges to the State's opening statement and closing argument for first and second-prong plain error. *Id.* ¶¶ 35-37. We explained that "[b]y contrasting defendant's actions of not turning himself in and not pleading guilty with [his codefendant]'s actions of talking to the police and pleading

guilty, the prosecutor was criticizing defendant's invocation of his constitutional rights to remain silent and go to trial," which was improper. (Internal quotation marks omitted.) *Id.* ¶ 45. The State compounded this error by arguing that defendant "has been running from the responsibility *he should be taking*" and that the jury should tell the defendant, "It's time for you to take responsibility for your actions." (Emphasis in original.) *Id.* at ¶¶ 46, 47. We affirmed, finding that the State's remarks were improper, but that the evidence was not closely balanced, so plain error did not occur. *Id.* ¶¶ 50, 84.

¶ 42    The key difference between *Williams* and this case is that, in *Williams*, the State contrasted the defendant's actions with those of his codefendant, who turned herself in to police, cooperated with them, and, most importantly, pled guilty. *Williams* instructs that it is improper for the State to argue that a defendant should have pled guilty like his codefendant, which did not happen here. It is proper for the State to discuss taking responsibility in the context of a "defendant's flight from the crime scene and disposal of the gun." See, e.g., *People v. Thompson*, 2013 IL App (1st) 113105, ¶ 83. Accordingly, we reject defendant's claim of prosecutorial misconduct during closing argument.

¶ 43                                    III. CONCLUSION

¶ 44    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 45    Affirmed.