2026 IL App (1st) 240533-U

No. 1-24-0533

Order filed March 19, 2026

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 22 CR 1321701 |
| | ) | |
| RICK COOK, | ) | Honorable |
| | ) | Thomas Joseph Hennelly, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE NAVARRO delivered the judgment of the court.
Justice Quish concurred in the judgment.
Justice Ocasio dissented.

**ORDER**

¶ 1    *Held*:    We affirm defendant's conviction for aggravated unlawful use of a weapon where the State presented sufficient evidence to prove him guilty of the offense, where remarks made during the State's opening statement were improper but not reversible error, and where defense counsel did not provide ineffective assistance.

¶ 2    Following a jury trial, defendant Rick Cook was found guilty of two counts of aggravated unlawful use of a weapon and one count of unlawful use of a weapon by a felon. After the trial court merged his convictions, it sentenced him to six years' imprisonment on a single count of

aggravated unlawful use of a weapon. Cook now appeals his conviction contending that: (1) the State failed to present sufficient evidence to prove him guilty; (2) the State committed reversible misconduct during its opening statement by referencing various, unrelated mass shootings; and (3) his defense counsel provided ineffective assistance by failing to object to certain testimony from a police officer. For the reasons that follow, we affirm Cook's conviction.

¶ 3                                I. BACKGROUND

¶ 4     The State charged Cook with two counts of aggravated unlawful use of a weapon, with one count (Count 1) predicated on him possessing a firearm without having a Firearm Owner's Identification (FOID) card and the other count (Count 2) predicated on him possessing a firearm without a concealed carry license. The State also charged Cook with a third count (Count 3) for unlawful use of a weapon by a felon.

¶ 5     The case proceeded to a jury trial. Prior to the parties' opening statements, the trial court provided the jury with various admonishments, including that "[o]pening statements are not evidence and [they] should not be considered as evidence by you. They are merely an aid for you in understanding the significance of the evidence when it is introduced." The State began its opening statement, where an assistant state's attorney immediately remarked:

> "Sandy Hook; Aurora, Colorado; Uvalde, Texas; Route 91 Harvest Music Festival,
> Paradise-Las Vegas, Nevada; Highland Park, Illinois. There is not much that needs
> to be said to talk about how guns are a danger. They are a weapon. They are made
> to be dangerous. That is their purpose. However, there are laws in place in the State
> of Illinois to allow you to carry a weapon. Those laws are clear."

Defense counsel did not object to the remarks. The assistant state's attorney continued and previewed the evidence she expected the State to present at trial. Following defense counsel's opening statement, the trial court noted to the jury that, during opening statements, "the prosecutor referred to some serious incidents of gun violence. Those incidents have nothing to do with this case and they will not be used in any way, shape or form in arriving at your verdict." Thereafter, the State began its case, which occurred over two days. The first day of trial consisted of the testimony of Chicago Police Officer Nicholas Pocius. The second day of trial consisted of the testimony of Chicago Police Officers Brandon McDonald and Gerardo Lopez.

¶ 6     The State's evidence showed that, in the evening of October 23, 2022, Officers Pocius and McDonald were working together as part of a tactical patrol unit. Because of their assignment, they were driving an unmarked police vehicle and wearing civilian clothes, though they wore a police vest identifying them as police officers. While working that night, they drove by a house on the 1300 block of West 110th Street in Chicago, where several individuals, including Cook, were congregating in the grassy parkway between the sidewalk and the street near a parked van. According to Officer Pocius, he and Officer McDonald were patrolling this area because it was "a high crime area" for illegal firearms, drugs and a couple robberies of postal workers. At trial, defense counsel did not object to these remarks. Officer Pocius observed the group of individuals smoking, and based on the smell, both he and Officer McDonald believed the group was smoking cannabis. While it was dark outside, the area was illuminated by lighting from houses and street lamps.

¶ 7     Officer Pocius wanted to investigate why the individuals were smoking on a public way and to determine if they were participating in a "repass." At trial, he explained a "repass" was a gathering following a funeral that frequently led to a shooting. Although Officer Pocius wanted to

investigate, he and Officer McDonald were outnumbered, and because situations like these "usually" involved "multiple illegal guns," according to Officer Pocius, they temporarily relocated and called for backup. At trial, defense counsel did not object to these remarks by Officer Pocius. Shortly thereafter, three additional officers, including Officer Lopez, arrived. The group of officers drove back to the residence on the 1300 block of West 110th Street, where Officer Pocius once again saw several individuals, including Cook, smoking what appeared to be cannabis. When Officer McDonald observed Cook, he noticed that Cook's hands were inside his front waistband, an indication that Cook was concealing drugs or a weapon.

¶ 8    As Officers Pocius and McDonald exited their vehicle and approached Cook, they both observed Cook quickly walk backward from near the street and begin to sprint down a driveway toward the house despite commands to stop. Both Officers Pocius and McDonald noticed that Cook was holding his waistband with his hand, and they both began to chase after him, with Officer McDonald leading the chase. In the driveway, there was a vehicle parked in the middle. To the right of the vehicle were cinder blocks and a trash can on the ground as well as part of a chain-link fence, which left a narrow opening to the right of the vehicle. Further down the driveway on the right side, there was an air conditioning unit and some lawn chairs adjacent to the residence. While running, according to Officer Pocius, Cook bumped into the chain-link fence and garbage can, though Officer McDonald did not observe Cook run into anything. While running after Cook, Officer Pocius observed an unknown object in Cook's right hand, then saw Cook's "right hand quickly go from his waistband," as in a "swipe motion," and heard a "loud ting of metal hitting metal," which he believed was a firearm hitting another metal object. Although at trial, Officer Pocius acknowledged that Cook bumping into the fence could have produced a metallic sound, he believed the metal-on-metal sound he heard was different. Officer McDonald also observed Cook

make a "throwing motion" and heard a "loud thump" of metal hitting metal. At trial, however, both Officers Pocius and McDonald acknowledged never seeing a firearm in Cook's hands. Eventually, Officer McDonald and another officer detained Cook in the backyard of the residence.

¶ 9     During Officer Pocius' testimony, the defense introduced, and later admitted into evidence, Defense Exhibit No. 1, which was his body-worn camera footage. Based on the video and Officer Pocius' testimony, after Cook was detained in the backyard, Officer Pocius searched the path Cook had taken, beginning with the area by the fence. While using a flashlight to search the area, Officer Pocius told another officer that he heard a "cling." After finding nothing by the fence and the front of the residence, Officer Pocius searched the side of the residence and found a loaded, semi-automatic Glock with an extended magazine lying on concrete next to the air conditioning unit. Officer Pocius then picked up the firearm using his bare hands. Officer Pocius explained at trial that ideally he would have picked up the firearm using gloves, but, based on the amount of individuals at the scene, he determined it was not safe to leave the firearm on the ground in order to retrieve gloves. As a result, the police did not test the firearm for fingerprints. According to Officers Pocius and McDonald, the only non-police officer near the driveway during the chase was Cook. While clearing the scene, Officer McDonald found two additional firearms under the van parked on the street.

¶ 10     During Officer McDonald's testimony, the State introduced, and later admitted into evidence, People's Exhibit No. 4, which was body-worn camera footage of him chasing after Cook. Because Officer McDonald was running, the video is shaky. Officer McDonald acknowledged that, in the video, no firearm could be seen. But there is a point in the video where Cook's right arm could be seen extended. At this point in the video, Cook appeared to be just beyond the air conditioning unit. However, prior to reaching near the air conditioning unit, Cook's

upper body was obscured based on the nighttime darkness. Also during Officer McDonald's testimony, the defense introduced, and later admitted into evidence, Defense Exhibit No. 2, which was the same body-worn camera footage as in People's Exhibit No. 4, but slowed down to half-speed. Officer McDonald testified that, in the video, he could not see Cook throw an object, but heard a "thump" sound. Still, at trial, Officer McDonald remained adamant that he saw Cook throw an object, but it was "[n]ot" captured "on the video." Defense Exhibit No. 1, Officer Pocius' body-worn camera footage, likewise did not show a firearm in Cook's hand. But because Officer Pocius trailed Officer McDonald, Cook's flight was barely visible in the video.

¶ 11    Prior to the second day of trial, Cook moved for a mistrial with prejudice based on the remarks by the assistant state's attorney during opening statements concerning unrelated mass shootings. The trial court highlighted that it provided the jury with an instruction to not consider the remarks and denied Cook's motion. At the conclusion of the State's case, it entered into evidence a stipulation that Cook had not been issued a FOID card or concealed carry license, and that he had been previously convicted of a qualifying felony offense to support the charge of unlawful use of a weapon by a felon. The defense rested without presenting any evidence.

¶ 12    After closing arguments, the trial court provided the jury with various instructions, including that "[o]pening statements are made by the attorneys to acquaint you with the facts they expect to prove. *** Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded." Following deliberations, the jury found Cook guilty on all three counts. Cook subsequently filed a posttrial motion, but the court denied it. The court then merged his three convictions into one conviction for aggravated unlawful use of a weapon predicated on him

possessing a firearm without having a FOID card, and sentenced him to six years' imprisonment on that conviction. This appeal follows.

¶ 13                                    II. ANALYSIS

¶ 14                    A. State's Request to Strike Portions of Cook's Brief

¶ 15    In the introduction to Cook's argument in his brief, he names several Black individuals who have been killed by the police while engaging in what he describes as "non-threatening, mundane behavior." In addition, Cook cites various sources *dehors* the record detailing alleged systemic racism within the Chicago Police Department and ultimately levies a claim that the officers involved in his case were, at the very least, implicitly biased against Black people.

¶ 16    It is well established that the record on appeal is limited to evidence that was produced in the trial court. *People v. Gomez-Ramirez*, 2021 IL App (3d) 200121, ¶ 15. As such, we cannot consider any arguments based on matters outside the record. *People v. Woolley*, 178 Ill. 2d 175, 204 (1997). Rather than striking portions of Cook's brief, as requested by the State, we simply adhere to our principles about the scope of review and only consider matters properly before us. As such, we will simply ignore any arguments and remarks based on matters *dehors* the record and confine our analysis to only the record on appeal.

¶ 17                          B. Sufficiency of the Evidence

¶ 18 With that preliminary issue addressed, we turn to Cook's claims on appeal, starting with his contention that the State failed to present sufficient evidence to prove beyond a reasonable doubt that he possessed a firearm to support his aggravated unlawful use of a weapon conviction. Cook highlights that the State did not present any DNA evidence or fingerprint evidence linking him to the firearm. Moreover, despite both Officers Pocius and McDonald testifying that he threw

a firearm while running from them, Cook argues that their body-worn camera video flatly contradicted their testimony.

¶ 19    When a defendant challenges the sufficiency of the evidence against him, we must determine whether, when the evidence is viewed in the light most favorable to the State, a rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt. *People v. Woods*, 2023 IL 127794, ¶ 56. "Under this standard of review, it is the responsibility of the trier of fact to fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." (Internal quotation marks omitted.) *People v. Jackson*, 2020 IL 124112, ¶ 64. We afford such deference to the trier of fact on these issues, in particular witness credibility, because it is in the superior position to evaluate the credibility of a witness by virtue of observing the witness testify firsthand. *People v. Dorsey*, 2023 IL App (1st) 200304, ¶ 114; *People v. Rodriguez*, 2012 IL App (1st) 072758-B, ¶ 45. Given this deference, the reviewing court does not retry the defendant, and thus, we do not substitute our judgment for that of the trier of fact on issues affecting the credibility of witnesses or the weight of the evidence. *Jackson*, 2020 IL 124112, ¶ 64. In turn, a jury's finding on credibility "is entitled to great weight." *People v. Smith*, 185 Ill. 2d 532, 542 (1999). Yet, "its determination is not conclusive." *Id*. If a witness's testimony is "too improbable, unconvincing, and contrary to human experience," we may reject it. *People v. Shaw*, 2015 IL App (1st) 123157, ¶ 29. And similarly, we will not reverse a defendant's conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Jackson*, 2020 IL 124112, ¶ 64.

¶ 20    To prove Cook guilty of aggravated unlawful use of a weapon predicated on possession of a firearm without having a FOID card, the State had to prove, *inter alia*, that he possessed a firearm

and he did so without having been issued a currently valid FOID card. 720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2022). Cook does not dispute that he lacked a FOID card, limiting his challenge on appeal to only whether the evidence sufficiently proved that he possessed a firearm. Whether a defendant possessed a firearm is a factual issue. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 27. Possession can occur through actual possession or constructive possession. *Id.* This is a case of actual possession, which can be proven through "testimony that the defendant exercised some form of dominion over the firearm, such as that he had it on his person, tried to conceal it, or was seen to discard it." *Id.*

¶ 21    In the instant case, when Officers Pocius and McDonald encountered Cook a second time after obtaining backup, Officer McDonald observed Cook's hands were concealed in his front waistband, a sign, according to Officer McDonald, that Cook was in possession of a firearm. See *People v. McGee*, 2025 IL App (1st) 231348-U, ¶ 20 (an officer's testimony that a defendant "was holding his waistband in a manner consistent with someone who was concealing a firearm" is evidence helping to prove that the defendant possessed a firearm). When the officers, who were wearing police vests identifying them as police officers, approached Cook, he immediately ran from them, which "indicates consciousness of guilt." *People v. Davis*, 2023 IL App (1st) 220231, ¶ 42. While Cook concedes that he ran, he posits that his flight does not indicate consciousness of guilt, but more reasonably demonstrates a fear of police or that he did not even know Officers Pocius and McDonald were police officers given they were in an unmarked vehicle and wearing civilian clothes. A fear of police is a plausible explanation for someone fleeing from the police. See *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (finding that it "is undoubtedly true" that "flight is not necessarily indicative of ongoing criminal activity"). Likewise, under certain circumstances, it might be reasonable for an individual to run when an unmarked vehicle stops suddenly in front

of him or her. See *United States v. Amuny*, 767 F.2d 1113, 1124 (5th Cir. 1985). But it is equally plausible that Cook's flight was based on a consciousness of guilt and his awareness that he was illegally possessing a firearm, especially given that Officers Pocius and McDonald wore police vests identifying them as police officers. Such an inference is eminently reasonable (see *Davis*, 2023 IL App (1st) 220231, ¶ 42), and the jury was therefore entitled to infer Cook's consciousness of guilt based on his attempt to flee from the police. See *People v. Bell*, 234 Ill. App. 3d 631, 637 (1992) (observing that, although "the jury is entitled to draw inferences from the evidence, such inferences must be reasonable"). In turn, on appeal, we must draw that inference in favor of the State. See *People v. Harvey*, 2024 IL 129357, ¶ 19 (when reviewing the evidence in the light most favorable to the State, "[t]his means that all reasonable inferences from the record in favor of the prosecution will be allowed").

¶ 22    Beyond Cook's initial flight from the police, while he was running away, both Officers Pocius and McDonald observed Cook make a throwing-type motion using his right arm and both heard the sound of metal hitting metal. When Officer Pocius searched along the route Cook ran, he found a firearm. The State's evidence of Cook's hands being concealed in his front waistband, his flight from the police, Officers Pocius and McDonald's observation of Cook making a throwing motion and the metal-on-metal sound, and the ultimate recovery of a firearm along the route Cook ran sufficiently proved that Cook possessed a firearm. For instance, in *People v. Lloyd*, 2025 IL App (1st) 232111-U, ¶¶ 5, 12-16, the appellate court found that the State presented sufficient evidence to prove that a defendant committed the offense of being an armed habitual criminal based on possession of a firearm where a police officer testified that, upon approaching the defendant, the defendant walked away and discarded an unknown object on top of a bush that turned out to be a firearm even though the officer's body-worn camera footage did not show the

defendant throwing a firearm. Similarly, in *McGee*, 2025 IL App (1st) 231348-U, ¶¶ 13, 20, the appellate court found that the State presented sufficient evidence to prove that a defendant committed the offense of unlawful use of a weapon by a felon based on possession of a firearm where two police officers observed the defendant running from them while holding his waistband in a manner consistent with someone attempting to conceal a firearm, and after he jumped over a fence, the officers retraced the defendant's path and found a firearm in plain view.

¶ 23    Although it is indisputable that the State did not present any DNA evidence or fingerprint evidence linking Cook to the firearm, "[t]he testimony of a single witness is sufficient to convict if the testimony is positive and credible." *People v. Gray*, 2017 IL 120958, ¶ 36. Here, there is the testimony of two police officers. While Cook does not quarrel with this well-settled principle, he argues that the testimony of Officers Pocius and McDonald was incredible, primarily based upon their body-worn camera footage, which Cook argues flatly contradicts their testimony. In turn, according to Cook, the jury acted unreasonably in finding that he possessed the firearm. First, Cook highlights that Officers Pocius and McDonald's body-worn camera footage never showed him throwing a firearm, let alone possessing a firearm. Second, Cook asserts that the "thump" sound identified by Officer McDonald in his body-worn camera footage was more consistent with Cook running into a metal object rather than the sound of a firearm hitting another object. Third, Cook posits that, while he ran past the air conditioning unit, his arm was not extended and where Officer McDonald's body-worn camera footage showed his arm extended, such an action was more consistent with his arm swinging while sprinting away than him throwing a weapon. Fourth, Cook notes that, as shown in the body-worn camera footage, he was wearing tight jeans, which he asserts could not reasonably hold a large firearm, as claimed by the officers.

¶ 24    During closing arguments, defense counsel made similar arguments to the jury, who, despite the claimed inadequacies in the State's case, found Cook guilty. Moreover, each and every argument Cook makes about the alleged inconsistencies between the testimony of Officers Pocius and McDonald and their body-worn camera footage, or how certain actions of his could more reasonably be explained by innocuous conclusions, are all within the province of the jury to resolve. See *Jackson*, 2020 IL 124112, ¶ 64. Although we are mindful that, when we review video evidence, the jury does not occupy a superior position to us like when observing witnesses testify (see *Shaw*, 2015 IL App (1st) 123157, ¶ 29), given the confluence of witness testimony and video evidence, and the need for those critical pieces of evidence to be reconciled, the jury remained in the best position to assess the totality of the evidence, including the credibility of Officers Pocius and McDonald. See *Lloyd*, 2025 IL App (1st) 232111-U, ¶ 15 (observing that "the jury was in the best position to assess [the officer's] credibility for themselves by observing the body worn camera, [the officer's] demeanor as a witness, and [the] defendant's impeachment inquiries").

¶ 25    As noted, we need not accept a jury's credibility determination if a witness's testimony is "too improbable, unconvincing, and contrary to human experience." *Shaw*, 2015 IL App (1st) 123157, ¶ 29. Having reviewed Officers Pocius and McDonald's testimony together with their body-worn camera footage, their testimony is not so improbable, unconvincing, and contrary to human experience such that we may reject the jury's determination that they were credible witnesses. Critically, Cook ran from the officers, both of whom observed Cook make a throwing-like motion while running near the air conditioning unit, both heard a metal-on-metal sound, and a firearm just so happened to be found next to the air conditioning unit, none of which was conclusively disproven by their body-worn camera footage. While we agree with Cook that, in the body-worn camera footage of Officer McDonald, his body is clearly illuminated by lights at

approximately 9:49:58 p.m. and no firearm is visible, Officers Pocius and McDonald began chasing Cook approximately six seconds earlier. Based on them running after Cook and their bodies jostling, their body-worn camera footage is shaky, not to mention that, while Cook is running down the driveway toward the air conditioning unit, his upper body is obscured for critical split seconds in Officer McDonald's body-worn camera video based on the nighttime darkness. It is eminently possible that he discarded the weapon during this timeframe. Moreover, Officers Pocius and McDonald never expressed any doubt that Cook had tossed a weapon, they never saw anything in Cook's hands that was not a weapon, and they did not observe any other civilians running where Cook ran.

¶ 26    These critical facts are what make the circumstances of the present case different from those in *People v. Bell*, 2024 IL App (1st) 200460-U, ¶ 29, a case in which the appellate court reversed a defendant's conviction for unlawful use of a weapon by a felon based on insufficient evidence. There, when two Chicago police officers stopped their unmarked police vehicle intending to conduct a field interview with three individuals, including the defendant, he along with another individual ran, both while holding their waistband. *Id.* ¶ 4. While running after the defendant, one of the officers observed him grab an object from his waistband and toss it. *Id.* ¶ 5. The officer heard a thud sound when the object landed on the ground, and while he could not tell what the object was, he knew it was dark. *Id.* The officer eventually lost sight of the defendant, but began to search the area where the defendant tossed the object. *Id.* ¶ 6. While searching, he found a firearm approximately 10 feet from where the defendant had been running. *Id.* During cross-examination, the officer acknowledged that, at the time he was chasing after the defendant, he observed the defendant with a bottle in his hand. *Id.* ¶ 8. Additionally, in the body-worn camera

footage from the officer that detained the defendant, the officer could be heard saying "so if [the defendant] was in the lot[,] we'll put it on him." *Id.* ¶ 11.

¶ 27 In finding that the State presented insufficient evidence, particularly that the defendant possessed a firearm, the appellate court observed that no officer testified to observing a firearm let alone the outline of one and that the chasing officer only observed the defendant grab an unknown object from his waistband and toss it. *Id.* ¶ 28. The court highlighted that the chasing officer acknowledged that the defendant had a bottle in his hand at the time and the apprehending officer's comment on body-worn camera video that, if the defendant was in the lot, they would " 'put it' " on him. *Id.* To this end, the court noted that "clearly even the officers were not convinced that the gun they recovered had been in [the defendant's] possession." *Id.* Moreover, because the defendant was not the only one who ran from the police, the court asserted that the recovered firearm "could just as well have been in [the] possession" of the other individual who ran from the police. *Id.* The critical facts that led the appellate court in *Bell* to reverse the defendant's conviction for unlawful use of a weapon by a felon are not present in the instant case. Consequently, when viewing the State's evidence in the light most favorable to it, there was sufficient evidence that Cook committed aggravated unlawful use of a weapon.

¶ 28                    C. State's Opening Statements

¶ 29 Cook next contends that the State committed reversible misconduct when, during the beginning of its opening statement, the assistant state's attorney named the cities of multiple mass shootings in the United States—Sandy Hook, Aurora, Uvalde, Paradise-Las Vegas and Highland Park. According to Cook, in naming these incidents, which had nothing to do with his case, the assistant state's attorney inflamed the passions of the jury by connecting him to tragic criminal

behavior when he was not even charged with discharging a firearm and resulted in the jury being prejudiced against him.

¶ 30    The State, however, posits that Cook forfeited this contention of error by failing to raise a contemporaneous objection at trial to the allegedly improper remarks. "It is well settled that, to preserve an issue on appeal, a defendant must object to the purported error at trial and include it in his written posttrial motion." *People v. Glasper*, 234 Ill. 2d 173, 203 (2009). A contemporaneous objection is required because, "[b]y failing to contemporaneously object at trial, a party denies the trial court the opportunity to correct errors immediately, and may gain the advantage of obtaining a later reversal through the failure to act." *People v. Williams*, 2017 IL App (1st) 142733, ¶ 46. Conversely, Cook argues that, by moving for a mistrial, he fully preserved his claim of error. However, this court has made clear that moving for a mistrial at a later time does not obviate the need for the earlier, contemporaneous objection to preserve the claim of error for review. See *People v. Euell*, 2012 IL App (2d) 101130, ¶ 18. As a result, because Cook has framed his contention of error as one of prosecutorial misconduct, and not that the trial court erred by denying a mistrial, his failure to contemporaneously object to the allegedly improper remarks made by the State during opening statements results in him forfeiting this contention of error.

¶ 31    When a defendant forfeits a contention of error for review, he has two primary procedural avenues to have the contention reviewed on appeal despite the forfeiture, either through arguing for plain error or ineffective assistance of counsel for failing to preserve the issue. See *People v. Graham*, 206 Ill. 2d 465, 475-77 (2003). The plain-error doctrine applies when a clear or obvious error has occurred, and either: (1) "the evidence [was] so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) the "error [was] so serious that it affected the fairness of the

defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Belknap*, 2014 IL 117094, ¶ 48. Under the plain-error doctrine, the defendant has the burden of persuasion to show plain error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). And thus, "[a] defendant who fails to argue for plain-error review obviously cannot meet his burden of persuasion." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). Because Cook is steadfast in his belief that he has preserved this contention of error for review, he has not argued for plain-error review and therefore, forfeited plain-error review. See *id.* at 547. Cook also has not raised a claim of ineffective assistance of counsel related to this contention of error.

¶ 32 Nevertheless, "forfeiture is a limitation on the parties, not the court, and we may exercise our discretion to review an otherwise forfeited issue." *People v. Curry*, 2018 IL App (1st) 152616, ¶ 36. We do so in this case because of the importance of establishing parameters surrounding the proper remarks the State may make during opening statements. "The purpose of an opening statement is to apprise the jury of what each party expects the evidence to prove." *People v. Kliner*, 185 Ill. 2d 81, 127 (1998). To this end, during an opening statement, the State has wide latitude to discuss the evidence it intends to present and any reasonable inferences therefrom. *Id.*; *People v. Jones*, 2016 IL App (1st) 141008, ¶ 21. Despite its wide latitude, "comments intending only to arouse the prejudice and passion of the jury are improper." *Jones*, 2016 IL App (1st) 141008, ¶ 21. However, even if the State makes improper remarks during its opening statement, the remarks are not automatic grounds for reversal. "Reversible error only occurs where the remarks are attributable to deliberate misconduct of the prosecutor and result in substantial prejudice to the defendant." *People v. Smith*, 141 Ill. 2d 40, 64 (1990). While we review whether remarks were improper for an abuse of discretion, we review the more critical question of whether improper remarks warrant a new trial *de novo*. *People v. Cook*, 2018 IL App (1st) 142134, ¶ 64.

¶ 33   In the instant case, the assistant state's attorney's remarks about mass shootings in other locations, such as Sandy Hook, Aurora, Uvalde, Paradise-Las Vegas and Highland Park, can only be seen as intending to inflame the passions of the jury. These mass shootings resulted in the deaths of many individuals, including children, and referencing them only can be seen as fueling the emotions of jurors at the onset of trial. Notably, the allegations against Cook had nothing to do with mass murder, a single murder, let alone discharging a weapon. Rather, the allegations against him were only that he possessed a weapon illegally. While a serious allegation, it is nothing like what occurred in the horrific shootings in Sandy Hook, Aurora, Uvalde, Paradise-Las Vegas and Highland Park. The remarks about those incidents were undoubtedly improper (see *Jones*, 2016 IL App (1st) 141008, ¶ 21), which the trial court also readily acknowledged by *sua sponte* instructing the jury to disregard them at the end of the defense's opening statement.

¶ 34   Despite those remarks being improper, they do not constitute reversible error. The remarks were brief and fleeting, and as noted, the trial court gave a *sua sponte* curative instruction directing the jury to not consider them. See *People v. Thomas*, 172 Ill. App. 3d 172, 179 (1988) (observing that "improper prosecutorial remarks can be cured by instruction to the jury to disregard" such remarks). In addition, before the State's opening statement, the court provided the jury general admonishments, including that "[o]pening statements are not evidence and [they] should not be considered as evidence by you. They are merely an aid for you in understanding the significance of the evidence when it is introduced." See *People v. Willis*, 409 Ill. App. 3d 804, 814 (2011) (observing that "improper [remarks] can be corrected by proper jury instructions, which carry more weight than the [remarks] of counsel"). Furthermore, while these comments were the first ones that the jury heard in the case, any potential prejudice was mitigated by the fact that the trial occurred over two days. Moreover, the assistant state's attorney never repeated the remarks, and

following closing arguments, the court reiterated to the jury that opening statements were not evidence and any remarks made during them not based on the evidence should be disregarded. Given these circumstances, we have no doubt that the jury's focus was on the evidence of the case and not extraneous comments about serious, unrelated incidents of gun violence made by the State during opening statements.

¶ 35 Nevertheless, Cook compares the remarks of the assistant state's attorney in his case to those in *Jones*, 2016 IL App (1st) 141008. There, during opening statements, an assistant state's attorney referred to the defendant as a " 'criminal' " four times, including twice after the trial court told the jury to disregard the comment. *Id.* ¶ 6. In finding reversible error, the appellate court observed that the comments were the jury's first introduction to the defendant and the State's repeated reference to him as a criminal "effectively nullified the effect of the court's instruction to disregard the State's characterization of [the] defendant as well as its admonishment that openings were not evidence." *Id.* ¶ 25. In contrast to *Jones*, the assistant state's attorney, while referencing serious, unrelated incidents of gun violence, never labeled Cook a "criminal" or any other pejorative or derogatory term. And even though the assistant state's attorney made improper references to mass shootings, she never repeated the remarks following the trial court's curative instruction. As a result, unlike in *Jones*, the trial court's instructions cured the assistant state's attorney's improper remarks. Consequently, we cannot say that the State's comments during opening statements resulted in substantial prejudice to Cook. See *Smith*, 141 Ill. 2d at 64.

¶ 36                                D. Ineffective Assistance of Counsel

¶ 37 Lastly, Cook contends that his defense counsel provided ineffective assistance by failing to object to portions of Officer Pocius' testimony. The first instance occurred when Officer Pocius described why he and Officer McDonald did not immediately investigate the large group,

including Cook, congregating in front of the residence on the 1300 block of West 110th Street. Officer Pocius explained: "There were six people. There is me and my partner. Usually in our past experiences when we see a group like that there are multiple illegal guns, and just not safe." The second instance occurred when the State asked Officer Pocius why he wanted to stop and investigate the large group. Officer Pocius asserted: "To stop them and see why they were smoking on the public way and what was going on, what we commonly call a repass." Officer Pocius then explained that a "repass" was a gathering following a funeral that frequently led to a shooting. The final instance occurred when the State asked Officer Pocius why he was patrolling that particular residential area. In response, he stated: "That's a high crime area. We had a lot of arrests in that area, a lot of illegal firearms, drugs, couple of robberies of postmen." Cook argues that this testimony from Officer Pocius was irrelevant to the allegations against him and prejudiced the jury by portraying him as a dangerous criminal.

¶ 38     The United States and Illinois Constitutions guarantee a defendant the right to the effective assistance of counsel. *People v. Gayden*, 2020 IL 123505, ¶ 27 (citing U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8). When evaluating claims of ineffective assistance of counsel, the defendant must satisfy the two-part test established in *Strickland v. Washington*, 466 U.S. 668 (1984). See *Gayden*, 2020 IL 123505, ¶ 27. Under the test, the defendant must establish that his counsel's performance was deficient and the deficient performance prejudiced him. *Strickland*, 466 U.S. at 687. More specifically, the "defendant must establish both that counsel's performance fell below an objective standard of reasonableness and that a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Gayden*, 2020 IL 123505, ¶ 27. The defendant must prove both prongs of the *Strickland* test to succeed. *Id.* We review whether the defendant received ineffective assistance of counsel *de novo*.

*People v. Johnson*, 2021 IL 126291, ¶ 52. Because generally, it is easier to dispose of an ineffective assistance of counsel claim on prejudice grounds, we should do so when the circumstances allow. *People v. Albanese*, 104 Ill. 2d 504, 527 (1984) (citing *Strickland*, 466 U.S. at 697).

¶ 39    In the instant case, Cook has failed to prove prejudice from his attorney's allegedly deficient performance in failing to object to the various testimony by Officer Pocius. As we have discussed in our analysis about the sufficiency of the evidence, Officer McDonald observed Cook's hands inside his front waistband, an indication that he was potentially concealing a weapon, Officers Pocius and McDonald both observed Cook make a throwing-like motion while near the air conditioning unit and they both heard a metal-on-metal sound. Notably, when Officer Pocius retraced the route that Cook ran, he just so happened to find a firearm next to the air conditioning unit. This evidence plus Cook running from the officers, an indication of consciousness of guilt, and the fact that the body-worn camera footage did not conclusively disprove any of the officers' testimony, made the evidence against Cook strong. As a result, the jury would have found Cook guilty regardless of the admission of Officer Pocius' testimony about a "repass," the potential for multiple, illegal firearms being present based on the group congregating outside, and the area being one of "high crime." That is to say, even if Cook's defense counsel made successful objections to Officer Pocius' testimony, there is not a reasonable probability that he would have been found not guilty of aggravated unlawful use of a weapon. Consequently, Cook's ineffective assistance of counsel claim fails.

¶ 40                    III. CONCLUSION

¶ 41    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 42    Affirmed.

¶ 43    JUSTICE OCASIO, dissenting:

¶ 44    I would reverse because Rick Cook's trial was tainted by racial bias and prosecutorial misconduct.

¶ 45                                              I.

¶ 46    For me, this case is an easy reversal. The problem began with the prosecutor's opening statement. The prosecutor started by reciting a litany of some of the most notorious mass shootings in history. I agree wholeheartedly with the majority that the only reason to do this was to inflame the jury. The accused is always entitled to a fair trial before an impartial, unbiased jury. *People v. Cole*, 54 Ill. 2d 401, 411 (1973). The opening argument was a calculated attempt to prejudice the jury against Cook. The prosecutor was *trying* to deprive him of a fundamental constitutional right, a bias-free and fair trial. This amounts to deliberate prosecutorial misconduct. The trial court should not have tolerated that, and neither should we.

¶ 47    But in the end, that is exactly what the majority does. To be sure, it condemns the prosecutor's flagrant violation of her special duties as a prosecutor. But it then lets her off the hook on the theory that her transparent effort to violate Cook's right to a fair trial did not work. Why not? Because, the majority finds, the prosecutor's cynical attempt to prejudice the jury was "brief and fleeting," the court told the jury to disregard it, and the matter was not raised again over the two-day-long trial. I do not share the majority's confidence.

¶ 48    One reason is that, although the State refrained from continuing to name-drop infamous mass shootings, it kept talking about shootings anyway. It elicited testimony that there had been shootings in the neighborhood. It elicited testimony that Cook and his companions were engaged in a post-funeral activity that "usually" ended with a shooting. It even elicited testimony that, if

the officers did not immediately pick up the gun they found on the ground, the result would, again, be a shooting. Lest the jurors forget this important information, the prosecutor made sure to remind them during rebuttal closing argument that the officers had testified that they were aware of shootings that had taken place. This case did not involve any shootings. Why, then, did that subject keep coming back up?

¶ 49    The other reason is that the reference to mass shootings was so clearly improper that I find it impossible to believe that the prosecutor did not anticipate the court's curative instruction. The only surprise would have been that the court decided to issue it *sua sponte*—one would have expected defense counsel to prompt the court to act by objecting. But that did not deter her: she went ahead with it anyway. It is fair to infer that she, at least, thought it would be worthwhile, even if the court gave a curative instruction. One wonders if that is because she knew that the topic of shootings would rear its head repeatedly over the course of trial.

¶ 50    Whatever her reason, it would seem that her gambit worked. She got to take her shot at inflaming the jury, and the State got its conviction at the end. At the end of her opening statement, the prosecutor trumpeted the importance of rules: "We are here because the defendant could not follow the rules, the same rules that the people in Cook County and the State of Illinois follow every day." The rules, it seems, apply to Rick Cook but not to assistant state's attorneys. Unlike the majority, I do not think that Cook received the fair trial to which our fundamental law guarantees him. I would reverse and remand for a new trial.

¶ 51                                      II.

¶ 52    There is another basis for reversal in this case: the State repeatedly elicited inadmissible testimony that invited the jury to speculate and appealed, intentionally or not, to implicit racial biases, and Cook's attorney failed to object to it.

¶ 53    It is hardly a secret that racial bias infects our criminal justice system. Our supreme court acknowledged as much in 2020. See Press Release, Ill. Supreme Court, Supreme Court Releases Statement on Racial Justice, Next Steps for Judicial Branch (June 22, 2020), https://www.illinoiscourts.gov [https://perma.cc/E66J-2ZYX].

¶ 54    In recent years, we have paid more and more attention to biases that, unlike intentional discrimination, easily escapes our notice—what is often termed *implicit bias*. Implicit biases arise from our natural cognitive process, which include automatic and unconscious associations that "can influence our perceptions, judgments, and behaviors without our conscious intent." L. Song Richardson, *Systemic Triage: Implicit Racial Bias in the Criminal Courtroom*, 126 Yale L.J. 862, 875-76 (2017). These processes are not inherently bad. They are, in fact, necessary because they "help us to cope with all the information that confronts us by making quick, automatic, and unconscious associations in response to a stimulus." *Id.* at 875. But they work by relying on cognitive shortcuts—including racial stereotypes. *Id.* at 876.

¶ 55    What does implicit bias mean for criminal trials? Even when judges and juries try their best to be fair, their implicit biases will always be at play. The reality is that those biases generally disadvantage Black and Brown defendants. "There is copious evidence that individuals of all races have implicit racial biases linking blacks with criminality and whites with innocence." *Id.* We try to combat this through education. For instance, we now have pattern jury instructions that address implicit bias. See Illinois Pattern Jury Instructions, Civil, No. 1.08 (approved May 2018); Illinois Pattern Jury Instructions, Criminal, No. 1.01B (approved April 30, 2021). The committee comments to these instructions note that awareness helps, but it does not appear to eliminate the problem altogether. This makes sense: How can you teach someone to be aware of something that, by definition, happens automatically or without conscious thought?

¶ 56    As difficult as it may be to root out implicit bias entirely, we can still limit the damage. In the context of trials, one obvious thing to do is avoid needlessly exposing juries to evidence that is likely to play into implicit biases. In our adversarial system, the onus is placed squarely on counsel to be vigilant in protecting a client's interests, especially the interest in a fair trial. Generally, that is done by objecting to evidence that risks activating implicit biases.

¶ 57    The record here, however, shows that defense counsel failed to guard against evidence that created just that risk.

¶ 58    To begin, Officer Pocius testified that he and his partner were doing routine patrol when they came across a group of several people gathered in front of a home on West 110th Street and smoking cannabis. Although they intended to stop and investigate, they did not do so immediately, he explained, because they were outnumbered. He then elaborated that "[u]sually in our past experiences when we see a group like that there are multiple illegal guns," so it was "just not safe" for them to confront the group without backup.

¶ 59    Here already we have the seed of implicit bias from the loaded phrase "a group like that." We have all, at one time or another, read or heard someone use this or similarly vague circumlocution to avoid uttering an explicit racial stereotype. A group like what, exactly? A group of Black people smoking cannabis outside on a warm night? If it had been a group of White people smoking cannabis, would the officer have still assumed that they were illegally armed? Add to that the officer's characterization that such a group is "just not safe," which raised the image of a racialized menace.

¶ 60    Take note that the officer's testimony is speculative. He has no idea whether there are any illegal guns around. Yet by giving voice to his hunch, he does not merely justify his decision to investigate further, he invites the jury to infer that there was an already high *ex ante* probability

that Cook had a gun on him: *Aha! The officer said that groups "like that" are usually carrying guns illegally, so it makes sense that the defendant would be carrying a gun illegally.*

¶ 61    The speculation did not end there. Continuing his testimony, Officer Pocius surmised that the group was having "what we commonly call a repass," a post-funeral gathering at the deceased's home. He opined that these events were rife with substance abuse and, ultimately, violence: "[U]sually at the repasses there is a lot of drinking and smoking of cannabis." He then added that a repass "usually leads to a shooting." Now, we have leapt from a "group like that" being "just not safe" to actively manufacturing fear of deadly violence.

¶ 62    Once again, the officer's testimony is speculative. He does not know that it is a "repass." He does not know that anybody is armed. He certainly does not know whether the gathering presages a shooting. Yet he testifies to all of those things anyway, again inviting the jury to draw conclusions about whether Cook was likely to be armed based on unsubstantiated conjecture. Even worse, that conjecture plays right into the seed of racial bias he had just planted when he testified that people in a "group like that" are usually carrying illegal guns.

¶ 63    Later, at the end of Officer Pocius's direct examination, the State elicited, totally unnecessarily, that he and his partner were patrolling that particular neighborhood because it was "a high crime area" and that there had been "a lot of arrests in that area" as well as "a lot of illegal firearms [and] drugs." There had even been a "couple of robberies of postmen." (No evidence was presented as to whether mail carriers were often still walking their routes at 9:53 p.m.)

¶ 64    What any of this had to do with whether Rick Cook was in possession of a gun is beyond me. It seems to be an attempt to suggest an inference of guilt by geographical association: he is in a dangerous neighborhood, so he must be a dangerous person. And again, it makes that suggestion using language—the "high crime area" cliché—that "can easily serve as a proxy for race and

ethnicity." *People v. Harris*, 2011 IL App (1st) 103382, ¶ 14 (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000)).

¶ 65      According to one scholar, using the designation of a high-crime area to justify stopping and searching an African American based on reasonable suspicion is blatantly racist. The designation of an area as a high crime area presents two primary issues. Firstly, it permits law enforcement officers to presume that individuals in these areas are more prone to engaging in criminal activities. More importantly, such high crime areas often have disproportionately large African American populations. See Reshaad Shirazi, *It's High Time to Dump the High-Crime Area Factor*, 21 Berkeley J. Crim. L. 76, 84 (2016).

¶ 66      What the foregoing shows is that the jurors in this case heard, without objection, the officer give testimony that in a subtle yet very real way amounted to a racialized presumption of guilt. Was that the intent of the officer or the prosecutor who conducted the direct examination? The answer does not matter. Deliberately or not, this testimony was improper speculation that created an enhanced risk of prejudice because it played into the kinds of implicit racial biases likely to affect a juror's deliberations about a Black defendant.

¶ 67      Cook argues that counsel's failure to object to this evidence deprived him of his right to the effective assistance of counsel. I question whether it should even be necessary to go that far. A claim of ineffective assistance is, at root, a claim that the proceeding was itself unfair; counsel's inadequate representation is merely the particular circumstance leading to that conclusion. See *Strickland v. Washington*, 466 U.S. 668, 694 (1984). I would submit that, when racial bias is injected into a criminal trial, that fact alone taints the fairness of the proceeding such that we should not presume that the verdict of guilt is worth relying on, and the onus should be on the State to show beyond a reasonable doubt that racial bias was not responsible in any way for the verdict.

See *Chapman v. California*, 386 U.S. 18, 24 (1967) ("Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless. *** We, therefore, *** hold *** that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."). I do not think that burden can be met in this case.

¶ 68    Even so, Cook has shown that counsel's failure to object to this evidence amounted to ineffective assistance. All of the testimony I have discussed was objectionable, whether on grounds of relevance (Ill. Rs. Evid. 401, 402 (eff. Jan. 1, 2011)), lack of personal knowledge (Ill. R. Evid. 602 (eff. Jan. 1, 2011)), improper opinion (Ill. R. Evid. 701 (eff. Jan. 1, 2011)), or danger of unfair prejudice (Ill. R. Evid. 403 (eff. Jan. 1, 2011)). The State defends this evidence under the too-easily abused course-of-investigation theory. See generally *People v. Boling*, 2014 IL App (4th) 120634, ¶¶ 116-118 (bemoaning the "repeated abuse" of this theory of relevance as a means of eliciting hearsay). Nonsense. The only testimony necessary to explain why the police were there and why they decided to initiate the stop were that (1) the officers were on a routine patrol and (2) they initiated the sidewalk stop because there were people openly smoking cannabis on the public way. The officer's personal speculations and hunches about the nature of the group he saw, what they were doing, and whether they were illegally armed were, at best, marginally relevant. Any proper probative value that testimony carried was easily outweighed by the danger of unfairly prejudicing the jury. See Ill. R. Evid. 403 (eff. Jan. 1, 2011).

¶ 69    This testimony was inadmissible and highly prejudicial. Counsel's failure to object to its admission therefore amounted to deficient performance. See *People v. Moore*, 279 Ill. App. 3d 152, 159 ("Sound trial strategy *** embraces the use of established rules of evidence and

procedure to avoid, when possible, the admission of incriminating statements, harmful opinions, and prejudicial facts.").

¶ 70    The majority does not reach deficient performance, instead finding that this testimony was not prejudicial because the evidence of guilt was "strong." I do not think it was. The evidence showed that Cook was holding his waistband, Cook ran from the police, the police saw him make a throwing or swiping motion, the police heard a metallic sound, and, after Cook was apprehended, an officer found a gun near the path Cook had taken. Cook did not make any admissions. Nobody testified to seeing him with a gun. There was no forensic evidence tying him to the gun. Even if this evidence was enough to sustain a conviction under the deferential sufficiency-of-the-evidence standard, a different trier of fact might well have found that the State had not met its high burden. Prejudice can occur whenever a verdict of not guilty would have been reasonable. *People v. Rouse*, 2022 IL App (1st) 210761, ¶ 61.

¶ 71    The majority avers further that Cook's running from police insinuates consciousness of guilt. Again, I respectfully disagree. An innocent person might flee from police if he or she "believes that contact with the police can itself be dangerous." *Illinois v. Wardlow*, 528 U.S. 119, 132 (2000) (Stevens, J., concurring in part). Author and journalist Ta-Nehisi Coates has explained, "All you need to understand is that the [police] officer carries with him the power of the American state and the weight of the American legacy, and they necessitate that of the bodies destroyed every year, some wild and disproportionate number of them will be black." Ta-Nehisi Coates, *Between the World and Me* 103 (2015). A Black man fleeing at the sight of the Chicago police is just as easily understood as a response to the "measurable amount of fear and distrust of police" found in many of the city's communities. See *People v. Horton*, 2019 IL App (1st) 142019-B; see also E. Ashby Plant & B. Michelle Peruche, *The Consequences of Race for Police Officers' Responses to*

*Criminal Suspects*, 16 Psych. Sci. 180, 182 (2005) (finding that sample of police officers in computer-based experiment were "initially more likely to mistakenly shoot unarmed Black suspects than unarmed White suspects"). When choosing which inference to draw, Cook's jury had been primed by Officer Pocius's testimony to pick the inculpatory one.

¶ 72 And this weak case was not presented until the seed of bias had been planted. Officer Pocius's testimony primed the jury to believe that Cook was armed. The officer told the jury that he knew "group[s] like that" would "[u]sually" have "multiple illegal guns." He also told the jury that, absent intervention, a repass would "usually lead[ ] to a shooting." In his telling, the discovery of a gun was not just possible—it was practically inevitable. The determinative issue at trial was whether Cook had a gun that he disposed of when the police showed up and chased him. Officer Pocius's improper opinion gave the jury a basis to overlook the absence of strong evidence tying Cook to the gun.

¶ 73 Worse, the State actually highlighted Officer Pocius's speculation during its rebuttal closing argument:

"And Officer Lopez's body camera, you saw when his body turned, there was that group of people by that van smoking a joint. That's exactly what they were there to investigate, what's going on. *And lo and behold, there were two guns just underneath that van. The officers' instincts, their knowledge, their training, their experience, they were correct.*

*What else were they*[ ] *correct about?* Seeing this defendant with his hands on his waist, seeing this defendant throw an object. They didn't lie to you. They didn't tell you they saw that object to be a gun. They didn't tell you any of that because they told you the truth. In the waistband, flung it out, and threw it." (Emphasis added.)

¶ 74    Given that the State actually drew the jury's attention on this inadmissible and prejudicial testimony, I cannot say with any confidence that counsel's failure to object had no effect on the verdict. That is, by definition, the prejudice necessary to establish ineffective assistance of counsel. *Strickland*, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

¶ 75                                                          III.

¶ 76    In my view, either of these issues—the State's deliberate attempt to prejudice Cook's right to a fair trial and counsel's ineffective failure to object to Officer Pocius's speculative and bias-activating testimony—warrant a new trial. I respectfully dissent.